John R. Davis, Admr.

*v.*

James E. Thornley *et al.*

*Opinion filed October 26, 1903.*

Contracts—*courts favor amicable adjustment of contested claims.* An amicable adjustment of a contested claim between litigants will not be set aside upon the grounds of fraud or lack of mental power to contract, where the evidence offered to sustain such charges is slight and unsatisfactory.

Appeal from the Appellate Court for the Third District;—heard in that court on appeal from the Circuit Court of Morgan county; the Hon. Owen P. Thompson, Judge, presiding.

Samuel Thornley, a resident of Morgan county, died on the 26th day of March, 1901. A will executed by him on the 24th day of September, 1875, was produced and offered for probate. After providing for the payment "of all just debts and funeral expenses," the will, save the attestation and subscription clauses, was as follows:

"*First item*—I give, devise and bequeath to my brother Hugo Thornley, his heirs and assigns, all the moneys of which I am now possessed or may be hereafter; also all the goods and chattels, and implements of husbandry and farming utensils, of which I am now or may hereafter be possessed. And lastly I do nominate and appoint Hugo Thornley to be the executor of this my last will and testament."

Hugo Thornley, mentioned as the devisee and legatee in the will, a brother of the testator, departed this life some two years prior to the death of the testator. The testator left surviving him neither widow, child, children nor descendants thereof, or living brother or sister. He left as his only heirs-at-law sixteen nieces and nephews, viz., the seven appellees herein, being the children of his

said deceased brother, Hugo Thornley; Thomas Kershaw, the appellant's intestate, the only child of Ann Kershaw, a deceased sister; six children of a deceased sister, Bettie Wood, and two sons of another deceased sister, a Mrs. Waggoner. After a contest the will was admitted to probate in the county court of Morgan county. James E. Thornley and E. H. Thornley were appointed administrators with the will annexed. They accepted the trust, qualified, received letters of administration and entered upon the work of administering the estate. The Kershaw, Wood and Waggoner heirs entered into contracts to release and assign all of their interests in and to the property and estate of every kind to the heirs of said Hugo Thornley, deceased, and executed the necessary instruments to carry into effect such an assignment. Some months afterward Thomas Kershaw filed in the county court a petition, in which he set up that the sale and assignment of his interest for $5370 were procured at a time when he was, by reason of intoxication and mental disease, incapable of contracting, and that appellees, by fraud and deception as to the value of his interest in the estate, procured him to make an assignment of the same to them. He asked that the order for distribution be set aside, that he be permitted to file objections to the report of the administrators, and that they be ordered to pay him the one-fourth interest inherited by him, less the $5370 already paid. Answer was filed to the petition and a hearing had. The county court sustained the prayer of the petition, and ordered that on distribution the administrators should pay to Kershaw one-fourth of the amount to be distributed, less the amount of $5370 which he had received from the appellees. The cause was removed to the circuit court of Morgan county by appeal and was again there heard, and an order entered in affirmance of the judgment which had been entered in the county court in probate sitting. By a further appeal the cause came into the Appellate Court for the Third

District, where the judgment of the circuit court was reversed and the cause remanded to that court, with directions to dismiss the petition. While the cause was pending in the Appellate Court, the death of the petitioner, Thomas Kershaw, was suggested, and John R. Davis, his administrator, was substituted as a party. This is an appeal prosecuted by the administrator from the judgment of the Appellate Court.

JOHN A. BELLATTI, for appellant.

MILLS & McCLURE, for appellees.

Mr. JUSTICE BOGGS delivered the opinion of the court:

We have carefully read the abstract of the testimony heard in the trial court, and agree with the Appellate Court that it is not sufficient to uphold the finding that Kershaw was, at the time of the execution of the assignment to the appellees, mentally incapable of executing the instrument or that the execution thereof was obtained by misrepresentations or other fraud. Kershaw was of the age of about fifty-two years. He resided in St. Louis, Missouri, and had lived there for nearly twenty years. He was the father of five children, whose mother died about twelve years before the trial. His occupation was that of a "tuck pointer." The work of a tuck pointer is to replace mortar in the mortar joints between the brick or stones in the walls of buildings, chimneys, smoke-stacks and other structures. It appeared that he had indulged in drinking intoxicating liquors more or less during the greater part of his life, and that at times he drank immoderately, but it did not appear that his excesses were such as to prevent him from continuing the labor of his calling, though he was thereby required to stand and move about on scaffolds or supports at high and dangerous elevations. The proof also falls far short of showing that he was in any degree incapacitated, by reason of intoxication, on the day when he contracted

to dispose of his interest in the estate and executed the instrument to effectuate the assignment thereof to the appellees. The contention seems rather to be, that by reason of long continued and excessive indulgence in intoxicants his mental faculties had become permanently impaired. Witnesses were produced who expressed opinions to that effect, but cross-examination developed that few, if any, of these witnesses regarded him as mentally wanting in power to transact the ordinary business affairs of life, though some thought him so incapacitated during temporary periods of actual intoxication. These witnesses, except his son and daughter, resided in central Illinois, and their opportunities to meet with him and observe his conduct and habits within the last twenty years had been slight and infrequent. That he was rational and competent to comprehend and transact business affairs was testified to by a number of witnesses, among others, Joseph Schiereck, whose business is that of examining titles as an employee of the Title Guarantee and Trust Company of St. Louis; John C. Gilbert, superintendent of the Morgan Brass Foundry Company of St. Louis; F. M. Wedding, a grocer in St. Louis; and Frank Nonn, a grocer and saloon-keeper, also of St. Louis. These witnesses were all residents of the city of St. Louis, knew Kershaw, met him frequently, had social and business relations with him and frequent and ample opportunity to form correct opinions as to his mental condition. Their testimony was entirely irreconcilable with the contention that he was wanting in mental power to understand and transact business affairs. Facts and circumstances disclosed by the testimony of a number of other witnesses are also inconsistent with that view. It was proven he came to Jacksonville for the purpose of looking after his interests in the property of his deceased uncle. Others of the nephews and nieces of the deceased testator who had like interest with himself in preventing the entire property of the testator from passing to the

Thornley heirs, the appellees, under the will, had employed counsel to resist the admission of the will to probate. He entered into a written contract with the same counsel to appear for him, and his cause has been conducted in all the courts, including this hearing, by such counsel so employed by him. The legal adviser so engaged was of the opinion that as Hugo Thornley, the legatee and devisee in the will, had died prior to the death of the testator, the legacy and devise would be held to have lapsed and the estate regarded as intestate, but expressed to the petitioner the view that the nephews and nieces of the testator would share the estate in equal parts, share and share alike,—that is, the heirs of the testator would take *per capita*, and not *per stirpes*. The petitioner, though understanding the legacy would be deemed to have lapsed, did not accept the view that he would only be entitled to share *per capita* and receive only a one-sixteenth part of the estate, but insisted that his mother, if alive, would have inherited an undivided one-fourth interest of all the property of which the testator died seized, and that he was entitled to stand in the shoes of his mother and take her part, he being her only heir. Further reflection and investigation convinced his counsel that this position was correct. Counsel presented objections to the admission of the will to probate, and a hearing of such objections was had. The court overruled the objections and the will was admitted to probate. This was on the 13th day of May, 1901. The nephews and nieces of the testator were present, except one who resided in Texas, and after the court had decided to admit the will to probate, propositions looking toward a settlement or compromise of the contentions involved in the litigation were advanced and discussed between them. The heirs of Hugo Thornley contended the legacy and devise were valid and invested the title and right to all the property in them. No settlement was, however, reached, but it was agreed that the parties should meet

at Virginia, in Cass county, on the 21st day of the month
to adjust their contentions, and, if possible, avoid litiga-
tion.  The petitioner executed a power of attorney confer-
ring on his uncle, Thomas Kershaw, Sr., of Jacksonville,
authority to act for and represent him.  The petitioner
returned to St. Louis.  It was afterwards rumored that
the attorney in fact for the petitioner had determined
not to attend the meeting of the parties at Virginia, and
E. Hierman, whose wife was one of the nieces of the. tes-
tator, and Eli Wood, a nephew of the testator, were so
informed by said Thomas Kershaw, Sr., and, understand-
ing the Thornley heirs were disinclined to compromise or
buy out a portion, only, of the contestants of the will,
went to St. Louis to urge the petitioner to be present at
Virginia, and he returned with them on the day fixed for
the meeting.  The petitioner met a number of persons at
Virginia on that day before he entered into the contract
to assign to the Thornley heirs his interest in the estate.
We think the testimony of these persons, together with
that of the petitioner and of Wood and Hierman, estab-
lished beyond doubt that he was not on that day inca-
pacitated by reason of intoxication.

It appeared from the testimony of the petitioner, and
that of all others who had any knowledge of the facts,
that the petitioner demanded the amount he received,
and that he well knew that it was for all of his interest
in the property of the estate, and that he directed the
banker through whom the payment to him was made, to
pay him $370 in currency and for the remainder to give
him a bank draft for $5000.  He was paid in this manner,
and returning to St. Louis put his money in the bank.
He made gifts of small sums to his two children, and told
his son he had put $3000 of the amount in the bank and
it was not to be touched.  Soon after, he took his son and
his daughter with him on a visit to another son who lived
in Canada, and defrayed the expenses of the party in the
greater part.  After he returned to St. Louis he engaged

in business as a saloon-keeper at the corner of Ninth and Palm streets, and conducted the saloon in his own name for about sixteen months, and was engaged in that business when the petition was filed herein. A few days before he appeared as a witness he gave up the business. Whether he was successful or why he withdrew from the saloon business was not disclosed by the testimony. A thorough study of the evidence leads to the conviction he had full and complete comprehension of his acts, and that to hold that his transactions should be avoided on the plea that he had not the mental power demanded by the law to enable him to bind himself by his contracts, would be to raise the standard of contractual capacity to such a height that the power to contract would be denied to a very large class who have heretofore enjoyed that right without question.

We have considered the argument, pressed with much force, that the amount paid to and accepted by the petitioner for his interest in the estate was so grossly inadequate as not only to indicate lack of contractual power, but also to create a conclusive presumption of fraud. It is said the estate is worth $100,000, and that the legacy lapsed and the estate became intestate and descended to the heirs-at-law of the intestate *per stirpes;* that the mother of the petitioner, a sister of the intestate, would, had she been living, have become entitled, as heir, to one-fourth of the entire estate, and that the petitioner, the only heir of his mother, inherited such one-fourth, or $25,000; that he disposed of it for the grossly inadequate sum of $5370. It seems to be accepted by all parties that the estate will prove to be of the value of $100,000, less, of course, funeral expenses, costs of administering, etc. The situation which presented itself to the petitioner must, however, be kept in view. The owner of the estate, in his lifetime, had executed a will showing an intention to bestow the entire estate on Hugo Thornley. An effort to prevent that will from being admitted to

probate had failed.   The heirs of Hugo Thornley were insisting the devise operated to pass the whole estate of the testator to them under a proper construction of the will, and further, that if the devise to their father had lapsed and become ineffectual, the property would descend to all the heirs-at-law of the testator, share and share alike,—that is, *per capita*,—which view, if true, entitled the petitioner to but a one-sixteenth part of the estate.   The heirs of Mrs. Waggoner and Mrs. Wood, while differing with the Thornley heirs as to the legality of the devise and bequest, joined them in the insistence that the estate would descend to all the heirs of the testator in equal parts.   Counsel employed by the petitioner advised him at their first interview that the estate would descend *per capita* and not *per stirpes*, and that he would take but a one-sixteenth part.   It is true, that counsel afterwards, on reflection, changed his view on this point, and so advised the petitioner; but the will had been admitted to probate notwithstanding the objection urged in the probate court in behalf of the petitioner, the Wood heirs and the Waggoner heirs against the probate thereof, that the only devise and bequest therein had lapsed by reason of the death of Hugo Thornley before the death of the testator.   A compromise suggested by a portion of the heirs, to give the Thornley heirs $9000 and then divide the estate into sixteen equal parts, had been rejected by the Thornley heirs.   Other efforts toward a compromise had failed, and to avoid litigation another meeting of the heirs had been agreed upon.   Litigation involved, also, the payment of attorneys' fees under a contract which would leave the petitioner but one-half of whatever should be recovered.   He paid but $500 attorney's fees out of the amount which he received on the settlement of his claims.   He could but know the testator, his uncle, did not intend he should receive any part of the estate.   That the petitioner, under such circumstances, on the day fixed by the heirs,

204—18

accepted $5370 in full for his interest could not be declared to show either that he was lacking in mental power, or the amount be deemed so grossly inadequate as to stamp the transaction as fraudulent.

The evidence left no foundation for the charge in the petition that the Thornley heirs were guilty of entering into a conspiracy to defraud the petitioner. The testimony of the petitioner refuted the principal charge of fraud,—*i. e.*, that he was plied with intoxicating liquor in order to render him incapable of understanding what he was doing. It is clear he was not kept in ignorance of any material fact necessary to be known for the proper protection of his interests, nor does it appear he was deceived as to any such fact. There is nothing in the record to warrant the court in declaring the Thornley heirs did not in good faith believe the legacy had not lapsed, or that the estate, if intestate, would not descend to them in equal parts with the petitioner. Counsel representing the different parties seem, at the outset, to have concurred in the view that petitioner could in any event receive no more than a one-sixteenth portion, and counsel for the Thornley heirs still insist that such is the true rule of law applicable to the contention, and in this court present a brief in support of that view, in which they have collected, with much labor and research, the many authorities upon which they base their contention. The view we have taken of the case makes it unnecessary we should consider and determine that question, and we only advert to it for the reason it bears upon the question which we do decide in the case. Courts are inclined to favor amicable adjustment of contested claims between litigants, and finding that neither lack of contractual mental power nor the intervention of fraud entered into the settlement here made, our conclusion is, as was that of the Appellate Court, that it should stand.

The judgment of the Appellate Court is therefore affirmed.                    *Judgment affirmed.*